U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET



**The following constitutes the ruling of the court and has the force and effect therein described.**



**United States Bankruptcy Judge**

**Signed September 30, 2011**

---

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| AMERICAN HOUSING FOUNDATION, | § | Case No. 09-20232-RLJ-11 |
| | § | |
| | § | |
| Debtor. | § | |

| | | |
|---|---|---|
| WALTER O'CHESKEY, Chapter 11 Trustee, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Adversary No. 10-02018 |
| | § | |
| TERRILL J. HORTON, | § | |
| | § | |
| Defendant. | § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

On April 18 - 21, 2011, the Court conducted a trial in the above-captioned adversary

proceeding (the "Adversary Proceeding"). Appearing at trial were counsel for Walter O'Cheskey,

the duly appointed and acting trustee (the "Trustee") for the AHF Liquidating Trust, counsel for

Terrill J. Horton ("Horton"), and other appearances as noted in the record.

The Court concludes that the claim of Terrill Horton in this bankruptcy case is disallowed in accordance with section 548(a)(1)(B) of the Bankruptcy Code as a constructively fraudulent obligation of AHF.

In reaching this decision, the Court has reviewed and considered the arguments of counsel, the testimony of witnesses, the exhibits admitted into evidence at trial and the documents and pleadings filed in connection with this Adversary Proceeding.

Based upon the record, the Court now finds and concludes as follows, pursuant to Rule 52 of the Federal Rules of Civil Procedure, made applicable in this Adversary Proceeding by Federal Rule of Bankruptcy Procedure 7052.

I.

**FINDINGS OF FACT**

A.   **Overview: The Bankruptcy Case, This Adversary Proceeding, and Horton's Proofs of Claim**

**The Bankruptcy Case**

1.   On April 21, 2009, certain alleged creditors of the debtor American Housing Foundation ("AHF") filed an involuntary petition against AHF pursuant to chapter 11 of the Bankruptcy Code, thereby initiating an involuntary bankruptcy case [Case No. 09-20232] (the "Involuntary Case") against AHF. On June 11, 2009, AHF filed a voluntary petition pursuant to chapter 11 of the Bankruptcy Code, initiating a voluntary case [Case No. 09-20373] (the "Voluntary Case").

2.   On July 17, 2009, the Court entered its *Agreed Order Granting Motion to Consolidate Bankruptcy Cases* [Docket No. 88; Case No. 09-20232],

consolidating the Voluntary Case and the Involuntary Case into a single case (the "Bankruptcy Case") pursuant to Bankruptcy Rule 1015(a).

3.    On April 29, 2010, this Court entered the *Order Approving Appointment of Chapter 11 Trustee* [Docket No. 1104; Case No. 09-20232]. Walter O'Cheskey was then appointed as the Chapter 11 Trustee in the Bankruptcy Case.

4.    On December 8, 2010, this Court entered its *Findings of Fact, Conclusions of Law, and Order Confirming Second Amended Joint Chapter 11 Plan Filed by the Chapter 11 Trustee and the Official Committee of Unsecured Creditors* [Docket No. 1918; Case No. 09-20232] (the "Confirmation Order"), confirming the *Second Amended Joint Chapter 11 Plan Filed by the Chapter 11 Trustee and the Official Committee of Unsecured Creditors* [Docket No. 1909; Case No. 09-20232] (the "Plan").

**The Adversary Proceeding**

5.    On September 7, 2010, the Trustee filed the *Trustee's Complaint Against Terrill J. Horton to Avoid Guaranty as Fraudulent Obligation and to Subordinate Allowed Claim, Together With Objections to Claim* [Docket No. 1], thereby initiating this Adversary Proceeding.

6.    On October 1, 2010, Horton filed his *Motion to Dismiss "Trustee's Complaint Against Terrill J. Horton to Avoid Guaranty as Fraudulent Obligation and to Subordinate Allowed Claim, Together With Objections to Claim" Pursuant to Rules 12(b)(6) and 9(b)* [Docket No. 6] (the "Motion to Dismiss"). The Motion to Dismiss was denied.

7.     On January 27, 2011, Horton filed the *Original Answer and Counterclaim for Declaratory Judgment of Terrill J. Horton* [Docket No. 28].

8.     On February 17, 2011, the Trustee filed *Plaintiff's Answer to Defendant Terrill J. Horton's Counterclaim for Declaratory Judgment and Affirmative Defenses* [Docket No. 29].

9.     On March 2, 2011, the Court entered its Scheduling Order [Docket No. 38], which established April 14, 2011 as the docket call for trial.

10.    On April 13, 2011, the Court entered the Joint Pre-trial Order submitted by the parties. [Docket No. 64].

11.    On April 18 - 21, 2011, this Court conducted the trial.

**Horton's Proofs of Claim**

12.    On October 6, 2009, Horton filed his proof of claim in the AHF Bankruptcy Case in the amount of $1,528,345,53. Exhibit 1.

13.    On November 19, 2010, Horton filed his amended proof of claim in the amount of $1,528,345,53. Exhibit 2.

B.     **Background Facts: Terrill Horton, Melissa Ripley, and Steve Sterquell; the Horton Deal**

**Terrill Horton**

14.    Horton grew up in Arkansas and attended the University of Central Arkansas and the University of Arkansas at Fayetteville. He pursued an undergraduate degree in business and then attended the University of Oklahoma where he received a pharmacy degree in 1973. Horton returned to Arkansas and worked as a

pharmacist, first with WalMart and then in his own pharmacy. In the early 1980s, Horton moved to Dallas to join his brother in the home building business. This business, D.R. Horton Homes, was a great success and eventually went public. Horton became the president of the Dallas-Fort Worth Division of D.R. Horton. This was an approximate $100 million operation, with as many as 200 employees. Horton became wealthy as a result of his involvement with and ownership in D.R. Horton.

15. With the help of Melissa Ripley (see below), Horton handles his own business investments. He created and owns an investment company, Horton Capital, LLP. Horton has an interest in ten to twelve different limited partnerships which, in turn, own several real estate properties and projects. Horton, either personally or through an entity he controls, has purchased a corporate jet for approximately $12.9 million, which purchase was largely financed.

16. Horton is an educated, experienced, and savvy businessman. He has a working knowledge of partnership taxation, including Schedule K-1 forms. Horton received about ten Schedule K-1 forms for his 2008 taxes.

17. Horton initially engaged the Amarillo firm of Mullin Hoard & Brown, L.L.P. to represent him on the various legal issues that arose in connection with his investment and dealings with Steve Sterquell. He engaged Lovell, Lovell, Newsom & Isern, L.L.P. after this Adversary Proceeding was filed. Horton is a party to an agreement with other investors in which they share and participate in the payment of attorney's fees.

**Melissa Ripley**

18.     Melissa Ripley (sometimes "Ripley") is a full-time employee of Horton. She is an experienced accounting professional. Ripley graduated from Southern Methodist University in 1984 with a degree in business. After college, Ripley gained 13 years of bookkeeping and accounting experience, including experience dealing with taxes, tax forms, tax deductions, and other tax-related issues. In 1997, she passed the Certified Public Accountant ("CPA") exam on her second attempt (her first attempt was shortly after she graduated from college) and has acquired over 500 hours of continuing education since becoming a CPA. As Horton's employee, Ripley is responsible for collecting tax documents, including Schedule K-1 forms, for Horton's tax filings. Ripley also routinely assists Horton on all his business deals and investments. Ripley is deeply involved in all of Horton's business affairs. She is one of two employees of Horton Capital (the other being the pilot of Horton's airplane).

**Steve Sterquell**

19.     Steve Sterquell ("Sterquell") was an accountant and the founder and president of AHF. Sterquell died unexpectedly on April 1, 2009, reportedly by suicide. Sterquell's accounting firm, Sterquell, Hill and Goelzer, L.L.P., provided tax services to Horton. Sterquell's accounting firm prepared Horton's personal and partnership income tax returns for 2006, 2007, and 2008.

**The Horton Deal**

**October 2008**

20.     On October 20, 2008, Horton sent Sterquell a text message that stated as follows:

> I checked and I paid 5.25mm in taxes the last five years. I have an opportunity for a great investment. So, I am wandering [sic] when I could get the refund and how much I would need to put with your housing fund and how much would be available for me to invest.

Exhibit 7.

21.     One day later, on October 21, 2008, Horton sent Sterquell a second text message,

as follows:

> I looked at my returns and I have paid 5.25mm in taxes in the last 5 years. I have a good investment opportunity and my question is twofold. When will I be able to receive the refund? How much will I need to tie up with your foundation, or how much will I have available to use?

Exhibit 8.

22.     On October 23, 2008, Sterquell sent Horton a reply text message that read as follows:

> I am on my way home and will plan on getting with you this coming week. On the Foundation developments there is a cash investment. It is very short term and pays 12% interest. The ability to get your taxes refunded should not be difficult. I will prepare an [sic] summary and send to you when I get Home.

Exhibit 9.

**November 2008**

23.     On November 4, 2008, Sterquell met with certain people, including Horton,

Horton's wife, Melissa Ripley, Horton's son Trent ("Trent"), and possibly others

for at least one hour at Horton's office.

24.     The next day, November 5, 2008, Sterquell sent and Ripley received an email (the

"November 5 Email") that stated as follows:

> I enjoyed meeting with everyone yesterday.  **I have attached**
> the Family Trust document and **a schedule that reflects the**
> **proposed investment in White Chapel H.I., Ltd. (the H.I.**
> **is for Hurricane Ike).**    With several hundred limited
> partnerships and LLC it is helpful when I name to explain the
> usage.  Please let me know if tomorrow is still okay for Terry
> and Trent and what time is good.

Exhibit 12 (emphasis added).

25.     The November 5 Email contained two attachments: (1) a proposed trust agreement

and (2) the referenced "schedule" (the "Investment Chart"), which is set forth as

follows:

**White Chapel H.I., Ltd.**
**American Housing Foundation**
**Estimated HR 1424 Depreciation**

|  | Capital Investment | Partnership Loan | Partnership Ownership | Estimated Ordinary Loss | Estimated Tax Refund |
|---|---|---|---|---|---|
| American Housing Foundation | 20.00 |  | 0.01% | 5,000 | - |
| Terrill J. Horton | 157,080.00 | 1,413,720.00 | 78.54% | 12,400,000 | 2,480,000.00 |
| Trent J. Horton | 42,900.00 | 386,100.00 | 21.45% | 3,375,000 | 675,000.00 |
|  | $ 200,000.00 | $ 1,799,820.00 | 100.00% | $ 15,780,000.00 | $ 3,155,000.00 |

1 The tax refund is for 2004 and 2005 from a NOL created in 2008. This assume no taxes in 2008.

2 The partnership loan has 12%interest rate paid monthly and is due and payable on April 1, 2009.

3 The partnership loan is has a American Housing Foundation and Steve Sterquell as guarantors.

4 The capital invested is non-cash and can be an assignment of any asset or a undivided portion of an asset that you have owned for more than one year. The Capital Investment assignment will also be returned in 2009 unless you want to continue with additional depreciation until we get all of the $6,000,000 in previously paid taxes back.

Exhibit 12.

26.     Specifically, the Investment Chart attached to the November 5 Email:

•       Includes "White Chapel H.I., Ltd." in the title;

•       Lists Horton's capital investment as $157,080;

•       Lists Horton's partnership loan as $1,413,720;

•       Lists Horton's estimated ordinary loss as $12,400,000;

•       Lists the total estimated ordinary loss as $15,780,000; and

- Lists Horton's estimated tax refund as $2,480,000.

The Investment Chart makes no mention of a non-recourse note or of WI-Hurike, Ltd.

27.     On November 6, 2008, the day after Sterquell sent Ripley the November 5 Email with the Investment Chart, Ripley sent Sterquell an email indicating that Horton wanted to schedule another meeting with Sterquell. That email read as follows:

> Mr. Horton is having our office neighbor (lawyer) look over the trust, so it won't be ready until Monday. He does want to talk about the tax investment ASAP, so do you want to meet about that today or wait until early next week? Any time is fine.

Exhibit 14. They met in Dallas later that day. *See id.*

28.     On November 19, 2008, Sterquell again met with Horton and Ripley at Horton's office. That meeting lasted less than one hour. Sterquell brought to that meeting the following documents for Horton to execute.

(a)     The "White Chapel H.I., Ltd. Agreement of Limited Partnership" pursuant to which Horton would become a limited partner in White Chapel H.I., Ltd. ("**White Chapel**"). (Exhibit 17). White Chapel is the same name mentioned in the Investment Chart sent from Sterquell to Ripley in the November 5 Email. The White Chapel Agreement of Limited Partnership lists Horton's initial capital contribution as $157,080. This amount is identical to the amount that appears as Horton's capital investment on the Investment Chart attached to the November 5 Email. The Agreement of Limited Partnership for White Chapel provides that AHF is the general partner and has "exclusive responsibility and authority to take all action necessary or desirable to accomplish the purposes of the partnership and have exclusive control over the management and affairs of the partnership . . . ." *Id*. It further provides that AHF, as general partner, will receive an interest in the profits, losses and distributions of the partnership in accordance with its interest, which was a .01% interest. *Id*. Horton, as the sole limited partner, held a 99.99% interest. *Id*. The purchase actually results from a combination of Horton's interests and the interest that was contemplated for Trent Horton, Horton's son. The

agreement reflects that Trent Horton was to make a capital contribution of $42,900.00 and, in return, was to receive 21.45% interest. Trent Horton did not participate, however. As a result, Horton ended up with the entirety of the limited partnership interest. It further reflects that AHF made a capital contribution of $20.00 in return for its .01% interest. Paragraph 7.1 of the partnership agreement provides that the general partner is "not liable to the Partnership or the Limited Partners for losses sustained or liabilities incurred as a result of any error in judgment or mistake of law or fact (including simple negligence) or for any act or omission made in good faith in conducting the Partnership business, unless that error, mistake, act or omission was performed or omitted fraudulently or in bad faith or constituted gross negligence." Paragraph 9.1 of the agreement contemplates the removal or resignation of the general partner, but the agreement does not otherwise specify how the general partner is removed.

(b)     The "Assignment" in which Horton assigned his 1/3 ownership interest in Silverstone/Parker Pearson LP ("**Parker Pearson**"), an entity that owns a residential development valued at approximately $2 million called Silverstone, to White Chapel in exchange for a 99.99% limited partnership interest in White Chapel. (Exhibit 18). Horton's interest in Silverstone/Parker Pearson LP was valued at $157,080. This amount is identical to the amount that appears as Horton's capital investment on the Investment Chart attached to the November 5 Email. AHF owns a 0.01% general partnership interest in White Chapel. This percentage is identical to the percentage that appears as AHF's partnership ownership on the Investment Chart attached to the November 5 Email.

(c)     The "Promissory Note" evidencing a loan from Horton to White Chapel in the amount of $1,413,720 (sometimes the "**White Chapel Note**"). (Exhibit 19). This amount is identical to the amount that appears as Horton's partnership loan on the Investment Chart attached to the November 5 Email.

(d)     The "Guaranty" (sometimes the "**AHF Guaranty**") in which AHF guaranteed payment of the White Chapel Note to Horton. Exhibit 20.

29.     As stated at paragraph 28(a), Horton's assigned interest in Parker Pearson to

White Chapel was valued at $157,080.00. Horton testified that this value was

provided by Ripley; Ripley testified that Sterquell provided the value. Ripley was

involved in the preparation of this instrument to some extent as she added, in her

handwriting, Horton's interest in Parker Pearson as the interest being donated by Horton.

30. Although the White Chapel Note lists White Chapel as the borrower, Horton did not make his $1,413,720 check out to White Chapel. Instead, Horton made his check out to AHF. Ripley prepared the $1,413,720.00 check that was used to fund the loan. The check was cut to AHF because it was the general partner of White Chapel.

31. White Chapel owns a 47% limited partnership interest in WI-Hurike, Ltd. ("Hurike"). There is no evidence that White Chapel ever contributed anything for its 47% interest in Hurike.

32. Horton had a lawyer, albeit a "title lawyer" officing next door, review the trust instrument that was sent under the November 5 Email; he did not ask a lawyer to review any part of the Horton Deal. The Certificate of Formation for Hurike was issued November 25, 2008. *See* Exhibit 24.

**March - April 2009 / The $15.7 Million Non-Recourse Note**

33. At 5:13 p.m. on Friday, March 27, 2009, Sterquell emailed Ripley to advise her that she would be receiving a non-recourse promissory note for Horton to sign. That email read as follows:

> Glenda David will e-mail you a non-recourse promissory note for Terry to sign. The note has no liability and can only be paid from the proceeds generated with WI-Hurike, Ltd. This is the partnership that generated the losses.
>
> The reason for the note is to build basis. Terry has a large negative capital account that could become phantom income

with out [sic] the non-recourse promissory note.  I need the
note before I send the tax returns on Monday.

Exhibit 36.

34.    On the afternoon of Sunday, March 29, 2009, Glenda David, Sterquell's assistant,

emailed Ripley the non-recourse promissory note and an Investor Security

Agreement for Horton to sign. Exhibit 37. The note is from Horton to AHF; it was

in the principal amount of $15,748,305, accruing interest at 6.0%, and is dated

December 31, 2008 (sometimes the "$15.7 Million Non-Recourse Note"). *See*

Exhibit 39. No loan or advance was made for the note. The note provides that the

security for the indebtedness is Horton's interest in the White Chapel partnership.

*Id*. It further states that "the Principal Amount plus interest shall be due and

payable solely from the proceeds from White Chapel H.I., Ltd. . . . [i]n amounts

equal to the distributions . . . received by [Horton] from White Chapel . . . ." *Id*.

The non-recourse nature of the note arises from the provision stating that AHF as

lender may satisfy the debt evidenced by the note only by enforcement of its rights

pursuant to the security agreement and that Horton is not liable for a money

judgment in the event of default under the note or the security agreement. *Id*.

According to Ripley, this note was signed by Horton without discussion or

questions being asked.

35.    The Investor Security Agreement is also dated December 31, 2008. There are

many errors in the Investor Security Agreement. It reflects to be between Horton,

as the "Secured Party," and White Chapel, as the "Debtor." It recites that it is

issued to secure the obligation of White Chapel as debtor to make capital contributions to Horton according to the terms of the note attached as Exhibit A to the security agreement, which is a copy of the $15.7 Million Non-Recourse Note. The Investor Security Agreement states as follows: "[t]he Debtor [White Chapel] hereby assigns, delivers and grants to the Secured Party [Horton], a first and superior security interest (the "Security Interest") in its [White Chapel's] Limited Partnership Interest in the Secured Party [Horton] (the "Collateral"), to secure its obligation under the terms of the Note." The last page of the Investor Security Agreement reflects that the "Debtor" is Horton and the "Secured Party" is White Chapel. The signatures reflect Horton signing as the debtor and Sterquell signing as president of White Chapel, the secured party. Recitations at the beginning of the agreement identify the secured party as Horton and White Chapel as the debtor.

36.    Ripley did not see Horton's Friday (March 27) email, the Sunday (March 29) email, or the documents attached to the March 29 email, until 9:30 a.m. or later on Monday, March 30, 2009.

37.    At 9:30 a.m. or later on March 30, 2009, Ripley opened the March 29 email, printed the $15.7 Million Non-Recourse Note and Investor Security Agreement, and placed them on Horton's desk because Horton was not yet in the office.

38.    At some point between 9:30 a.m. and 10:19 a.m. on March 30, 2009, Horton signed the $15.7 Million Non-Recourse Note and the Investor Security Agreement. The amount of the note is nearly identical to the total amount listed as

estimated ordinary loss on the Investment Chart attached to the November 5 Email.

39.     The purpose of the $15.7 Million Non-Recourse Note was, according to Sterquell, to "build basis" for Horton so he could then, in turn, personally claim the losses flowing up from Hurike, through White Chapel, to him personally. Coen testified that a promise to make future capital contributions can build basis. The problem, however, is that had it played out as Sterquell orchestrated it, Horton's issuance of the $15.7 Million Non-Recourse Note would not have worked as a means to build basis. First, it was a note, a debt instrument, and not a promise of future capital contributions. Second, the note, likely by mistake, was made payable to AHF and not White Chapel; White Chapel was the entity from which he was receiving the passed-through loss and thus the entity in which he needed to build basis.

40.     Accordingly, at 10:19 a.m. on March 30, 2009, Ripley returned the signed documents to Glenda David via reply email.  Horton did not consult an attorney before he executed the documents. Ripley said that she did not notice that the note was backdated to December 31, 2008. Their intent (hers and Horton's) was to get the documents back to Sterquell immediately.

41.     The Horton Deal was a milestone event for Horton. Concerning the $15.7 Million Non-Recourse Note, Ripley testified that it was the largest note Horton had ever been involved with; that, prior to that, the largest note she had seen involving Horton was the $1,413,720 note payable to him in return for his loan to White Chapel.

42. According to Ripley and Horton, the next day, March 31, 2009, Horton came into Ripley's office and asked to see the $15.7 Million Non-Recourse Note again; that he then noticed it was backdated, which prompted him to make the following handwritten notations on the note: "Voided via phone call 3-31-09 Terrill Horton" and "Fraudulent date!!" Exhibit 39. Ripley said Horton left the note with her and gave her no directions or instructions to send the note back or to take any other action concerning the note.

43. Ripley did not send a copy of the $15.7 Million Non-Recourse Note (with Horton's handwritten notations) back to AHF or Sterquell. She did not send an email, text, or letter referencing the note, the fraudulent backdate, or the handwritten "void" entry to AHF or Sterquell. Neither Horton nor Ripley consulted an attorney regarding the fraudulent backdating and/or the purported voiding of the note. Ripley did not witness a phone call from Horton to Sterquell regarding the note. Horton did not speak to Sterquell regarding the note.

44. Instead, on April 1, 2009 at 7:06 a.m., Horton sent Sterquell a text message stating as follows:

> Happy 2nd quarter. I hate to bother you, but I need to know two things so I cam [sic] plan a temporary loan. When do you think the loan repayment will occur? Approximately when will my tax return be ready and how much refund will it be?

Exhibit 43.

45. Minutes later, at 7:10 a.m., Horton sent Sterquell another text message, as follows:

> Thank you Steve. You know I consider you a good friend, and when we catch our breath, I look forward to spending

> some time with you and planning for the future.  And may
> God bless you.

Exhibit 43.

46.　　Neither of the April 1, 2009 Horton text messages to Sterquell mention the $15.7 Million Non-Recourse Note, including fraudulent backdating.

47.　　The events of March 27, 2009 through April 1, 2009 concerning the finalization of the Horton Deal were precipitated by the fact that Horton was anticipating the April 15 due date for his personal tax return and his anticipated refund claim.

48.　　On the morning of April 1, 2009, Sterquell died, reportedly by suicide.

## C.　Testimony of Ripley and Horton Regarding the Horton Deal

### Ripley's Version

49.　　Ripley's testimony concerning the Horton Deal was confusing, inconsistent, and lacked candor.

50.　　Upon examination by the Trustee's counsel, Ripley testified that at the November 4, 2008 meeting, Sterquell made a proposal concerning estate planning matters and tax credits to be obtained from investing in properties damaged by Hurricane Ike. She also testified that the discussions centered on a loan by Horton to AHF. She denied that there was any discussion regarding the formation of a limited partnership or of a limited partnership named White Chapel. She also testified that she understood that a loan from Horton was to be made to facilitate his obtaining tax credits, though as a CPA, she was not able to explain how this could happen.

- 17 -

Finally, she testified that there were discussions regarding accelerated depreciation of airplanes.

51.    Upon examination from Horton's counsel, Ripley said the purpose of the meeting, at least in large part, was to discuss the benefits of depreciating Horton's aircraft. Horton and his son Trent, presumably through a partnership entity, owned a $12 million Gulf Stream aircraft. Sterquell explained the rules regarding depreciation of aircraft. She said she did not recall Sterquell even mentioning a loan to AHF (or White Chapel). She mentioned that Horton wanted Sterquell to assist him in a "claw back" of taxes paid in 2005 and 2006.

52.    Concerning the October 20, 2008 text message (Exhibit 7), Ripley said she did not see such message when sent and that the first time she saw it was during her deposition.

53.    The subject line on the November 5 Email states "Tax-Investment and Family Trust." Ripley admitted she read this email and opened-up the attachment for the family trust investment but testified during direct examination that she did not remember opening up the attachment for the Investment Chart. Then, during examination from Horton's counsel, she clarified that she did not open-up the attachment and had not seen the Investment Chart until this litigation. She admitted that she usually does open-up attachments to emails and that it is prudent to do so. Despite her testimony that White Chapel was not mentioned during the meeting the day before that gave rise to the November 5 Email from Sterquell, the

email specifically references "the proposed investment in White Chapel H.I., Ltd. (the H.I. is for Hurricane Ike)."

54. Concerning the November 6, 2008 email from Ripley to Sterquell (Exhibit 14), in which the subject line contains a reference to "Tax Investment and Family Trust," Ripley claimed ignorance of the meaning of "tax investment." She further testified that there was no discussion at the meeting (that resulted from this email) concerning tax investments, and that the only discussion was of "tax credits." She also testified, however, that Horton told her that prior to the meeting he wanted to discuss the "tax investment."

55. Ripley considers Horton a sophisticated business man, though she said he is not a "detail" or "numbers" person. She said he is a devout Christian and, in his business dealings with others, is trusting and values a person's character. Ripley offered this assessment of Horton to explain his lack of "involvement" with the details of the Horton Deal.

56. Ripley described Sterquell as "brilliant" and a person who was particularly appealing to Horton. She said Sterquell would talk to Horton about his missionary work and other Christian-based projects and ideas. She said she served as a liaison between Sterquell and Horton.

57. As for the various documents signed on November 19, 2008 that, in effect, constitute the gist of the Horton Deal and the basis for his claim here, both Ripley and Horton deny that they reviewed the documents and that Horton depended solely on Sterquell regarding the details of the Horton Deal.

58.     In self-serving testimony, Ripley said that she and Horton did not generally review documents presented to them by Sterquell (see previous finding), though they did consider and were impressed by the financial information regarding AHF and Sterquell that was provided to them by Sterquell. *See* Finding of Fact ¶ __ - __.

59.     The White Chapel Note (for $1,413,720) (Exhibit 19) is dated November 19, 2008, with a maturity of April 1, 2009. It is a simple one-and-a-half page form promissory note. Though the note clearly provides that White Chapel is the borrower and thus the maker of the note and Horton is the lender and thus the payee under the note, Ripley testified that she thought the loan was made to AHF (thus making AHF the maker of the note). She offered no explanation as to why AHF signed a guaranty of the note on the same date. She testified that the amount of the note, $1,413,720, was a large sum for Horton; that, in fact, it was the largest check she recalls Horton ever issuing. Despite this, she said neither she nor Horton read the note.

60.     Ripley testified during a deposition that she had not taken the family trust document to a lawyer. During trial, she said she did take it to a title lawyer that officed next door. Despite this, she had not corrected her deposition. This is, at best, indicative of her inability to recall what all did happen and what was discussed during the November 4 - 6, 2008 time frame.

61.     Ripley maintains a schedule of all K-1s issued in connection with Horton's partnership investments. She did not, however, add White Chapel to her schedule.

When asked why Horton's interest in White Chapel was not included, she simply reiterated that she considered the whole deal as a loan in her mind.

62. Concerning the events of March 27 - April 1 and specifically the March 27, 2009 email (Exhibit 36, ¶ ___), Ripley admitted that she, as a CPA, obviously knows what it means to "build basis" and to have a "negative capital account." She also understands that one cannot build basis by making a loan, i.e., by signing a non-recourse promissory note. In fact, she admitted that a loan should have nothing to do with partners' capital accounts. She said that the reference to "phantom income" "sounded bad." As a CPA, Ripley understands more about the concept of "phantom income" than that it "sounds bad."

63. She said she was nothing more than a bookkeeper that was limited to inputting information into a QuickBooks program. She even described her work for Horton as clerical or secretarial-type work. She said she had no knowledge of low-income housing, investments, or non-profit entities. She said she had no experience with "bonus depreciation programs." She basically disavowed *any* application of her accounting knowledge and experience.

64. Horton and Ripley both described Horton's situation regarding the Horton Deal as that of any typical wealthy businessman: he was looking for a way to recoup taxes paid in the good years of 2005 and 2006, given that his real estate investments had been hit by the financial meltdown in the fall of 2008, which, in turn, was triggering potential cash calls in some of his real estate partnership investments. Cash contributions were apparently required to pay debt on real estate projects.

This, according to Ripley and Horton, explained Horton's need to have the $1,413,720 note repaid by April 1, 2009.

65. Ripley further testified that Sterquell furnished them with his personal financial statement, reflecting a net worth of $9,751,685 (Exhibit 91) and a financial statement of AHF reflecting "net assets" of $87,499,161 (Exhibit 92). Ripley said she received these documents. She understood that Horton was making a loan and was seeking a tax credit in return.

66. According to Ripley, there was no effort on Horton's or her part to cover up anything in connection with the Horton Deal and that there was never any intention to participate in an illegitimate tax transaction.

67. Horton and Ripley both admitted that in retrospect, the Horton Deal, when coupled with the information concerning the pass-through losses flowing from Hurike to White Chapel and ultimately to Horton, constituted an illegitimate or improper tax scheme orchestrated by Sterquell.

**Horton's Version**

68. Horton's testimony regarding the Horton Deal is mostly consistent with Ripley's and can therefore be similarly characterized.

69. Concerning the November 4, 2008 meeting, Horton testified that they discussed a family trust and "investment ideas." He wanted to be part of one of Sterquell's investment opportunities; he specifically referenced apartment complexes. He said he was then ready to make an equity investment.

70.     Horton testified that a loan was not discussed at the November 4 meeting; that the

        subject of a loan came up later that evening. This does not correspond with

        Ripley's testimony regarding the discussions had at the meeting. Horton conceded,

        however, that Ripley's recollection of what was discussed may be more reliable.

71.     Horton testified that at the November 4, 2008 meeting, Sterquell promoted the

        utilization of "housing tax credits." In doing so, he provided Horton and Ripley

        with various promotional materials, which included a detailed brochure with

        financial information and photographs of various housing units; a copy of a

        January 2006 letter from the IRS regarding an audit of AHF for the 2003 tax year;

        and a promotional letter from AHF that highlighted the following quote from the

        IRS audit letter:

> Our examination of the information return(s) indicated above discloses
> that your organization continues to qualify for exemption from Federal
> income tax. Accordingly, we accept the return(s) as filed.

        Exhibit 95. The AHF letter then states that "[t]his no change opinion from the

        National Office of the IRS equates to the 'GOOD HOUSEKEEPING SEAL OF

        APPROVAL' for any charitable organization." *Id*.

        He also showed them a September 7, 2006 letter from the Stinson, Morrison &

        Heckler, LLP law firm to Sterquell that summarizes the IRS's 2003 audit of AHF

        as comprehensive and highly favorable to AHF. *See* Exhibits 94-98.

72.     Horton describes himself as trusting, perhaps to a fault, and agrees with Ripley's

        assessment of him. He does not typically scrutinize legal documents for his

personal and business transactions and he testified that he "sometimes" has lawyers review documents for him.

73. Concerning the email (Exhibit___), though Horton questions, "[h]ow much" he will need to "tie up" with Sterquell's foundation (obviously AHF and its many affiliates), he had no explanation at trial regarding the meaning of this question. In fact, he testified that he did not know what he meant by the question.

74. Horton had an approximate 24% interest in Parker Pearson, which owned unimproved real estate lots valued at approximately $2 million. He estimated there was perhaps $1.6 million in debt against the lots. He could not explain how his minority interest in Parker Pearson was valued at $157,080.00.

75. Horton said he did not really know what the $157,080.00 was to be used for, that the deal sounded to him like a good cause and that it would somehow allow him to receive tax credits.

76. Horton testified that he understood the $1,413,720 loan was needed to help get the housing fund properties up to HUD's standards.

77. Horton testified that he understood that White Chapel was involved in the Hurricane Ike damaged properties which, in turn, created the opportunity for an investment that would kick-off tax credits or some other form of tax benefits.

78. Horton admitted that a tax refund was discussed at the November 4 meeting. He also admitted that, had he seen the Investment Chart, it would have caused him to ask some questions but, alas, his questions would have gone to Sterquell, and he would have likely trusted Sterquell and what he told him.

79. Horton testified that he looked at the $15.7 Million Non-Recourse Note, saw that it was non-recourse, asked Ripley what it was for—she, in turn, read the email back to him which stated that its purpose was to build basis—and he signed the note. No more than fifteen to twenty minutes were spent concerning the note, per Horton.

80. Horton testified that the $15.7 Million Non-Recourse Note "bothered him"; that, specifically, it "bothered his conscience." He said it bothered him all afternoon and caused him to have a restless and sleepless night. In fact it bothered him so much that he avoided telling his wife about it.

81. Horton testified that the next day (March 31, 2009), he reviewed the note again, made his notations on the note, and said he tried to reach Sterquell to no avail. He said that though he did not try to confront Sterquell about the note the next day, he was upset with himself for having signed the note, especially given the note's size.

82. Horton testified that he never saw the Investment Chart; he also testified that he did not recall having had any knowledge of White Chapel. He said that he thought his loan was to AHF and that both his loan and his capital contribution were made to AHF. He therefore says he saw and relied upon financial information regarding AHF and Sterquell, respectively.

83. Horton testified that he never saw the tax returns and K-1s for White Chapel or Hurike until after the AHF bankruptcy was filed (April 21, 2009). Horton (and Ripley) was advised by Jeremy Goelzer of the White Chapel K-1.

D. **Post Sterquell's Death**

84. On April 2, 2009, the day after Sterquell's death, Ripley sent an email to Jeremy Goelzer, Sterquell's partner in his accounting firm, inquiring about how they were to "proceed with Mr. Horton's tax matters . . . ." She noted that "Horton had lent a significant amount of money to the AHF and he is depending on that investment to care for his family." Exhibit 44.

85. By email from Ripley to Jeremy Goelzer on June 3, 2009, Ripley asked if "we could use the losses from Horton Aviation as NOL to go back for the last couple of years . . . ." In the next sentence, she states as follows: "Just ignore any potential NOL from the AHF, and move on with filing the 2008 return and requesting any refunds from prior years? What are your thoughts?" Exhibit 45. Goelzer responded back on June 4, 2009, but does not specifically address Ripley's inquiry.

86. Ripley testified that prior to sending the June 3 email to Goelzer, she previously discussed with Goelzer the issue concerning any "potential NOL from the AHF." She explained that Goelzer had previously advised her that he was not comfortable with Horton using the NOL given the circumstances of Sterquell's death. She then passed along this information to Horton and he advised her not to use it.

87. Horton filed his personal tax return and did not claim the deduction from the losses contemplated by the Horton Deal and did not claim any refund as a result of the transactions that constitute the Horton Deal.

88. In connection with the completion of Horton's tax return for 2008, Ripley, in maintaining a schedule of K-1s, included the K-1 of Parker Pearson. Horton had assigned his interest in Parker Pearson to White Chapel to acquire his 99.99% interest in White Chapel. *See* Exhibit 47.

89. Despite conveying his interest in Parker Pearson to White Chapel as part of the Horton Deal, Horton still treats such interest as his. *See* Exhibit 62.

90. On March 27, 2010, Horton filed a proof of claim in the bankruptcy proceedings of Sterquell, Hill and Goelzer, L.L.P., Sterquell's former accounting firm. Such claim is in the amount of $1,413,720.00 and is based on the negligence of Sterquell and the accounting firm and for damages proximately caused to Horton as a result of such negligence. The addendum to the proof of claim states, in pertinent part, as follows:

> On November 4, 2008, Sterquell met with Horton and his wife, Sammie, Trent Horton, and Horton's accountant, Melissa Ripley, at the Horton Capital office located in Southlake, Texas.
> . . .
> During the November 2008 meeting, Sterquell recommended that Horton make a loan to White Chapel H.I., Ltd. . . . which would, in turn, become a limited partner of WI Hurike, Ltd. . . . White Chapel and WI Hurike were limited partnerships set up by Sterquell as tax shelters to take advantage of 2008 legislation designed to provide economic relief to areas affected by Hurricane Ike.
> . . .
> Sterquell represented that he would place White Chapel as a limited partner to WI Hurike and that Terry Horton would lend money to White Chapel for which Horton would receive a substantial deduction. Sterquell also represented to Horton that the loan to White Chapel would pay Horton interest and provide government tax relief.
> . . .
> **Based on Sterquell's representations and tax advice, on November 19, 2008, Horton made a loan to White Chapel, and White Chapel executed a note to Horton for $1,413,720.** The note

provided for 12% interest per annum from November 19, 2008 to April 1, 2009, the maturity date, and bearing interest after maturity at the rate of 18% per annum. [Sterquell, Hill and Goelzer, L.L.P.] and its partners and employees prepared tax returns and K-1s for this transaction. Goelzer prepared Horton's 2008 tax return, but Horton decided he should not take the deduction for the Hurricane Ike depreciation.

. . .

[The] damages include, but are not limited to the amount of money loaned by Horton to White Chapel H.I., Ltd., as well as attorney's fees.

Exhibit 119 (emphasis added).

91.     Horton filed an action titled "Terril J. Horton's Original Petition on Rejected Claims" in the probate proceeding pending in the County Court at Law No. 1 for Potter County, Texas, styled *Terril J. Horton, Plaintiff, vs. R. W. Calloway, as Dependent Administrator With Will Annexed of the Estate of Steve W. Sterquell, Deceased, Defendant*, Cause No. 28,676-01-1, in which Horton stated as follows:

On July 27, 2009 Plaintiff presented an authenticated unsecured claim in connection with his loan to White Chapel H.I. Ltd. in the amount of $1,588,741.31 . . . to the Dependent Administrator . . . . The White Chapel claim reflects a principal obligation of $1,413,720, plus accrued interest of $136,037.70 as of July 12, 2009 . . . and reasonable attorney's fees and costs of collection in the amount of $38,983.61.

Exhibit 120. Such action was filed sometime after Horton's referenced July 27, 2009 claim.

92.     Horton was contacted by Robert Templeton, another investor with Sterquell, who advised him that he was also involved in the "Hurike deal." Templeton informed him that he had hired a lawyer in Houston for advice regarding the legality of the

Hurike-related transactions. Horton did not know Templeton at the time of the Horton Deal.

E. **Sterquell's Illegitimate Tax Scheme**

93.    Stephen Coen testified as an expert witness for the Trustee. Coen is a lawyer with eighteen years experience working for the Internal Revenue Service ("IRS") and an additional ten years of experience in private practice as a tax lawyer. While with the IRS, he commonly reviewed deficiency notices to taxpayers with regard to the appropriateness of deductions or disallowance of deductions. He also addressed situations in which the IRS was proposing to assess penalties against taxpayers for taking illegitimate deductions. He was a project attorney for three separate tax shelter transactions. In his ten years of private practice, he has represented clients who have been assessed penalties by the IRS; such representation has included requests made on his clients' behalf for an abatement of penalties or a waiver of penalties. These requests have, in some cases, been based on reasonable reliance upon tax advice from an accountant or a tax preparer.

94.    In formulating his opinions, Coen used his experience and expertise as a practicing attorney and as a former in-house attorney with the IRS. He reviewed dozens of documents, including all documents and transactions in connection with the Horton Deal, the deposition transcripts of Horton and Melissa Ripley, respectively, and he obviously conferred with the Trustee and Trustee's counsel. In addition to the Horton Deal, Coen reviewed numerous other transactions which he defines as "soft money transactions." He defines soft money transactions as transactions in

which investors advance money to entities established by AHF for the purpose of paying soft costs, as opposed to hard assets. Such soft costs would include legal fees, appraisal fees, and fees to refinance properties.

95. Coen concluded that the Horton Deal was a transaction structured and papered as part of an abusive tax shelter transaction that was designed to provide Horton with losses of over $15 million. This in turn would create a tax refund for Horton of over $3 million.

96. Coen concludes that Horton knew or should have known that he was participating in an abusive tax shelter transaction. It is Coen's opinion that since Sterquell was the architect of the scheme, and thus its promoter, Horton's claimed reliance on Sterquell was unreasonable. His basis for this is the IRS's rule that it is not reasonable to rely upon a promoter because the promoter has an economic interest in the scheme. If faced with this argument, Coen predicts the IRS would not find such reliance as reasonable and would not, therefore, abate a penalty for taking an illegitimate deduction.

97. Horton is obviously not before the IRS in this proceeding and will not be as he did not claim the deduction contemplated by the Horton Deal. Despite this, Coen's testimony is instructive because it reveals that in an analogous circumstance, Horton's claim of reliance upon Sterquell would not be credited.

98. Horton did not receive the K-1s for White Chapel or Hurike and, according to Ripley, he never saw a tax return for either entity.

99.     The 2008 K-1 Schedule for Hurike, reflecting its partner's share of income, deductions, credits, etc., was issued by Hurike to its partner White Chapel. It reflected a 47% loss allocated to White Chapel in the amount of $15,617,138.00. *See* Exhibit 28. This K-1, along with a tax return for White Chapel reflecting such amount as the loss for 2008 (Exhibit 29), was discovered at Sterquell's office sometime after his death.

100.    White Chapel issued a K-1 for 2008 to its limited partner, Horton, reflecting Horton's 99.99% share of the pass-through loss of $15,748,730.00. *See* Exhibit 30.

101.    Ripley maintained a schedule of K-1s for partnerships in which Horton had an interest; she did not, however, maintain a schedule of K-1s for either White Chapel or Hurike. In addition, she testified that she never saw the K-1s issued to either White Chapel by Hurike or to Horton by White Chapel. She further said that she never reviewed the March 27, 2009 letters from White Chapel to Horton reflecting the transmittal to Horton of the White Chapel K-1. *See* Exhibit 31A. She testified in a similar fashion concerning the March 27, 2009 letter from Hurike to White Chapel with the enclosed Hurike K-1. This letter was addressed not to AHF but to White Chapel at the same address as was the letter to Horton, i.e., 1330 North White Chapel Boulevard, Southlake, Texas. Finally, Ripley denied receiving the March 27, 2009 letter from Sterquell, Hill and Goelzer, LLP to White Chapel at 1800 South Washington, Suite 311, Amarillo, Texas, including the 2008 partnership return for White Chapel. *See* Exhibit 32.

102. A second non-recourse promissory note in the amount of $15,748,305.00, dated December 31, 2008, was signed by Sterquell for White Chapel and made payable to AHF. Ripley never saw this note, she testified. It, like the Horton Deal, has an accompanying Investor Security Agreement. *See* Exhibits 41 and 42.

103. The partnership return for 2008 of Hurike was prepared by Sterquell, Hill and Goelzer, LLP. It reflects net losses of $33,507,036.00 from the operation of seven properties—the Aston Brook, Cimarron Park, Northwoods, Settler's Cove, Stoneridge, Ridge at Willowbrook, and Woodedge. All but Settler's Cove are located in Houston, Texas. Settler's Cove is located in Beaumont, Texas. *See* Exhibit 27. According to Coen, these seven complexes created "basis" in Hurike against which it could then charge the losses generated by the properties.

104. The seven properties ostensibly owned by Hurike for purposes of its 2008 tax return were also, at the same time, ostensibly owned by another AHF-affiliated entity, AHF Community Development, LLC. In addition, four of the seven were also reflected to have been "gifted" by LIHTC Community to an entity named Mid-Continent in 2007. Coen did not, in formulating his opinion, assume Horton knew that these properties were being claimed by three separate entities.

105. White Chapel's tax return, Form 1065 U.S. Return of Partnership Income for 2008, reflects a loss of $15,748,305.00. It is dated March 27, 2009. *See* Exhibit 29.

106. From the deposition testimony of Robert Templeton, he was to receive $2 million in losses credited to him personally from a $200,000.00 investment, a 10:1 ratio.

This is similar to the Horton Deal in which Horton was receiving credit for $15.7 million in losses on an "investment" (actually made largely as a loan) of approximately $1.5 million (the $157,080 contributed interest in Parker Pearson and the $1,413,720 loan).

107. Horton admitted at trial that Sterquell's scheme was designed as a fraudulent tax scheme and that he really could not defend it. His position is that he was simply taken along for the ride.

F. **AHF's Insolvency and Lack of Reasonable Equivalent Value to AHF**

108. Allen Weiner provided expert testimony concerning the solvency of AHF at the time of the Horton Deal, November 19, 2008. In doing so, he assessed the balance sheet of AHF, including the valuation of the major assets of AHF and major liabilities of AHF, as well as "tax credit" guaranty obligations of AHF. Weiner's assessment took into account AHF's interest in the various affiliated entities, which he terms "special purpose entities" and, specifically, the actual market values of the properties owned by the special purpose entities. *See* Exhibit 84.

109. Weiner concludes that as of December 31, 2008, shortly after the Horton Deal, AHF had total assets valued at $4,041,660.00 and total liabilities of $53,240,638.00. The total liabilities include claims arising from guaranties issued by AHF in connection with seventeen tax credit properties, which AHF or an AHF-affiliated entity served as a general partner in limited partnerships and typically owned approximately a 1.0% interest. According to Weiner, the guaranties were significant in substance and were justified given the considerable

price that investors paid for their interest in the limited partnerships. He concluded

that the guaranties were and still are very real liabilities of AHF. *See* Exhibit 84.

110. Weiner's opinion took into account that AHF, as a non-profit entity, owned an

interest either directly or indirectly in tax-exempt, bond-financed properties in

which there were approximately 34 properties owned by limited liability companies

in which AHF served as the 100% sole member. He likewise evaluated AHF's

ownership interest in tax-credit property investments, which concerned

approximately seventeen properties owned by limited partnerships, under which

AHF served either directly or indirectly as the 1.0% general partner. Finally, he

considered approximately thirteen properties, most of which were owned by

limited liability companies owned by AHF, with at least one property, the

Lakewood Terrace property, owned directly by AHF.

111. Weiner's conclusions concerning AHF's solvency as of November 19, 2008, is

credible, realistic, and relevant to a fact issue before the Court. Weiner holds a

Masters in Business Administration with a concentration in finance from the

Wharton School at the University of Pennsylvania and received his Bachelor of

Science degree in Computer and Information Sciences from the University of

Florida. He served as an expert during the pendency of the AHF Chapter 11

Bankruptcy Case on behalf of the Trustee and presently serves as president of the

reorganized AHF. His appointment as president was approved by all constituencies

in the Bankruptcy Case. Weiner has exhaustive personal knowledge of the AHF

Bankruptcy Case and the operations of AHF as a non-profit entity. He presently

also serves as Senior Financial Executive to Focus Management Group, which was employed by the Trustee with the Court's approval in the AHF Bankruptcy Case. His past experience includes involvement with the syndication of affordable housing properties, such as those owned by AHF, and he is one of two cofounders of the Raymond James Tax Credit Funds, which is a large, prominent affordable housing syndication. The Court finds that Weiner's testimony regarding AHF's insolvency is reliable.

112.    Weiner also provided his opinion concerning value received by AHF in connection with its issuance of the AHF Guaranty on the Horton Deal. In doing so, he reviewed all documents concerning the Horton Deal and considered and reviewed documentation concerning the tracing of the $1,413,720.00 that was loaned by Horton to White Chapel which, as stated above, was deposited with AHF. In this regard, he relied in part on the tracing of such funds provided by Harry Potter, an expert that was employed by the Unsecured Creditors Committee in the AHF Bankruptcy Case. Weiner concluded that the Horton funds were used to pay liabilities of affiliated subsidiaries of AHF with the proviso that approximately $300,000 was maintained by AHF on its balance sheet. Weiner concluded that because the Horton funds were used in connection with AHF subsidiaries, AHF did not receive reasonably equivalent value in return for its guaranty of the White Chapel obligation.

113.    The Court does not consider Weiner's approach as dispositive of the question of whether AHF received reasonably equivalent value for issuance of the guaranty.

114. AHF did not receive value for the guaranty and did not receive reasonable equivalent value because Horton's loan was made to White Chapel and not AHF. That AHF, as general partner, received the funds on behalf of White Chapel and directed the use of the funds, does not alter the Court's findings. It does, however, give rise to claims by White Chapel against AHF and other affiliated entities of AHF.

115. Weiner's testimony concerning reasonable equivalent value for the AHF Guaranty is instructive to the extent that it reflects that AHF ultimately received little or no benefit from the funds and thus further supports the Court's conclusion that AHF did not receive reasonable equivalent value for its obligation under the AHF Guaranty.

G. **What Horton Knew or Should Have Known**

116. Though Ripley contended that it was her understanding that the gist of Horton's involvement in the Horton Deal was the making of a loan to AHF, she recognizes, as a licensed CPA, that net operating losses are not obtained by the issuance of a loan. Horton is also charged with this knowledge.

117. Horton offered no explanation as to how he could, on an approximate $157,000 investment (and a loan of $1.4 million) obtain a $3+ million tax *refund*, resulting from over $15 million in individual losses. He naturally blames Sterquell and AHF and that he relied exclusively on advice and direction provided by Sterquell. But Horton knows that one simply cannot generate losses of over $15 million on a questionable investment of $157,000. It was, as is often stated, "too good to be

true." Horton did not understand the details of Sterquell's scheme; he chose to ignore the details of the scheme—the creation of the many entities, the diversion of funds, the many documents, the bogus deals, etc.—but he did understand and indeed he wanted the "clawback" of taxes he paid in prior years. At best, Horton turned a blind eye to the scheme.

118. In the few years prior to the Horton Deal, Horton paid over $5 million in taxes, and he was desirous of recovering some or all of the paid taxes. Horton understood that this was the primary objective of the Horton Deal.

119. Despite his testimony to the contrary, Horton knew, as of November 19, 2008:

- that he was a 99.99% interest owner in White Chapel, which interest arose from his contribution of his minority interest in the Parker Pearson partnership which was of questionable value;

- that AHF was the .01% general partner of White Chapel;

- that he made a loan to White Chapel in the amount of $1,413,720 and received a promissory note payable to him in return, of which White Chapel is the maker; and

- that AHF issued a guaranty in his favor of the White Chapel Note.

120. Horton knew that in return for his interest in White Chapel and the loan of $1,413,720 to White Chapel, he was to receive the principal amount of the loan plus interest at 12% and, in addition, an approximate $3 million tax *refund*.

121. Horton knew that the Horton Deal was an unusual transaction.

122.     At the November 4 meeting, Sterquell proposed that Horton make an "investment" in which huge losses would be generated for his use in claiming extraordinary tax benefits.

123.     Even if Horton and Ripley did not open up the Investment Chart attached to the November 5 Email from Sterquell to Ripley, the Investment Chart is evidence of what was discussed at the meeting on November 4, 2008. In addition, given the significance of what Horton was seeking—a $3 million tax refund—he is charged with the responsibility of insuring that the attachments that were included with the November 5, 2008 email were opened.

124.     Horton knew or should have known that the large tax benefits, here a $3+ million refund, are not achieved through loans. Ripley knew this; she is Horton's most trusted employee and, to a lesser extent, advisor. She knew this as a Certified Public Accountant and as Horton's executive assistant and the one person privy to virtually all of Horton's dealings. She and Horton worked as a team. They were aware of the significance and consequences of what Horton was achieving through the Horton Deal. Horton should have obtained proper professional advice regarding the legality of what Sterquell was proposing. Coen's testimony concerning the standard in connection with the Internal Revenue Service is instructive and helpful on this point.

125.     Horton was driven to obtain a recovery of a portion of the over $5.25 million in taxes he had paid in prior years. As a result, he, at best, turned a blind eye to what Sterquell was proposing. Horton signed the $15.7 Million Non-Recourse Note

knowing full well the note was bogus. Horton understands the legal effect of a promissory note. He knows that when he signs a promissory note as maker, he does so understating that a promissory note is in consideration of a loan, or goods or services provided to him.

126.    It is impossible to know if Horton (and Ripley) actually saw the Investment Chart on November 5, 2008, and if Horton actually wrote his comments—"Fraudulent Date!!" and "Voided via phone call 3-31-09 Terrill Horton"—on the $15.7 Million Non-Recourse Note on March 31, 2009. The objective evidence casts much suspicion on Horton's (and Ripley's) testimony in this regard. The Investment Chart and the $15.7 Million Non-Recourse Note evidences Sterquell's illegitimate tax scheme.

127.    Horton's and Ripley's testimony concerning both the Investment Chart and Horton's immediate about-face concerning the note, even if true, do not support a finding that Horton was acting in good faith in connection with the Horton Deal. At best, it reflects willful blindness to the facts. Apart from the Horton Deal, Horton did not know or understand all the details of Sterquell's illegitimate tax scheme.

128.    Horton did not rely upon any representation by Sterquell or AHF (through Sterquell) that the funds loaned by him to White Chapel would be used in any manner other than Sterquell's "housing fund," which includes AHF and its affiliates.

129.    Horton did not rely upon any implied representation at the time he made the loan

to White Chapel that White Chapel had the ability to repay the loan. Horton knew

that the funds loaned to White Chapel would not be repaid from assets of White

Chapel, which it held at the time. He knew White Chapel was formed to

accumulate losses that were to be passed on to him personally.

## II.

## CONCLUSIONS OF LAW

A.    **Jurisdiction and Venue.**

1.    The Court has jurisdiction over this Complaint and the causes of action asserted

herein under 28 U.S.C. §§ 157(a) and (b) and 1334.

2.    The causes of action asserted herein are core proceedings under 28 U.S.C. §

157(b). In the event a superior court determines that some or all of the causes of

action here are not core proceedings subject of the Court's jurisdiction, these

findings and conclusions are submitted as proposed findings and conclusions. *See*

11 U.S.C. § 157(c)(1) and *Stern v. Marshall*, 564 U.S. ___, 131 S. Ct. 2594

(2011).

3.    Venue of this action is proper in this Court pursuant to 28 U.S.C. §§ 1408 and

1409.

4.    The Court makes no findings or conclusions that implicate section 505 of the

Bankruptcy Code.

B.    **The Trustee's Causes of Action**

5.    The Trustee seeks to have Horton's claim as represented by his proofs of claim disallowed as a voidable fraudulent obligation under section 548(a)(1)(A) (the actual fraud provision) and section 548(a)(1)(B) (the constructive fraud provision) of the Bankruptcy Code. Alternatively, the Trustee asserts that Horton's claim should be disallowed or subordinated as an equity claim or a claim arising from the purchase or sale of a security. *See* 11 U.S.C. § 510(b). The Trustee also contends that Horton's claim may be subordinated under principles of equitable subordination. *See* 11 U.S.C. § 510(c).

C.    **Section 548(a)(1)(A) and (B) Causes of Action: Avoidance of Fraudulent Obligation**

6.    Section 548(a)(1) of the Bankruptcy Code provides as follows:

> The trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in property, or any obligation (including any obligation to or for the benefit of an insider under an employment contract) incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—
> (A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or
> (B)(i) received less than a reasonably equivalent value in exchange
>     for such transfer or obligation; and
>   (ii)(I) was insolvent on the date that such transfer was made or
>         such obligation was incurred, or became insolvent as a
>         result of such transfer or obligation;
>       (II) was engaged in business or a transaction, or was about to
>         engage in business or a transaction, for which any property
>         remaining with the debtor was an unreasonably small
> capital;
>         (III) intended to incur, or believed that the debtor would incur,
>           debts that would be beyond the debtor's ability to pay as such
>           debts matured; or

(IV) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

11 U.S.C. § 548(a)(1).

7.    This suit concerns AHF's "obligation" to Horton under the AHF Guaranty issued on the Horton Deal. The Horton Deal closed November 19, 2008, the date the documents were signed and the loan was made by Horton to White Chapel, with the AHF guaranty. It was incurred within two years of the April 21, 2009 involuntary filing against AHF, as well as within two years of AHF's voluntary filing on June 11, 2009. The Trustee contends the AHF obligation satisfies both the actual fraud basis (section 548(a)(1)(A)) and the constructive fraud basis (section 548(a)(1)(B)) for avoidance.

8.    The Horton Deal is, the Trustee argues, a fraudulent obligation under subsection (a)(1)(A) because the illegitimate tax scheme orchestrated by Sterquell is inferred to AHF to satisfy the "hinder, delay, or defraud" element of the cause of action.[1] The statute concerns the debtor's, here AHF's, fraud. AHF must be a sufficient participant in the scheme. There is no real dispute between the parties on this point as they both assume that, given Sterquell's total control of AHF and his use of AHF in the Horton Deal, AHF was sufficiently involved in any alleged fraudulent or improper conduct. The evidence supports this assumption. Sterquell was the

---

[1]*See In re Agric. Research & Tech. Group, Inc.*, 916 F.2d 528, 535-36 (9th Cir. 1990); *See also Sec. & Exch. Comm'n v. Res. Dev. Int'l, LLC*, 487 F.3d 295, 301 (5th Cir. 2007) ("In this circuit, proving that IERC operated as a Ponzi scheme establishes the fraudulent intent behind the transfers it made."); *Warfield v. Byron*, 436 F.3d 551, 558 (5th Cir. 2006); *See also Conroy v. Shott*, 9 Ohio Misc. 117, 363 F.2d 90, 92 (6th Cir. 1966); *See also Floyd v. Dunson (In re Rodriguez)*, 209 B.R. 424, 433 (Bankr. S.D. Tex. 1997).

president of AHF and was in total control of AHF; AHF is an asserted non-profit entity and thus has no shareholder involvement. There is no evidence that AHF's board exercised any control over Sterquell or that it ever monitored the transactions of AHF. AHF was a participant in the Horton Deal and thus significantly contributed to the effort to obtain the improper tax benefit for Horton. Horton said he was investing in Sterquell's "housing fund."

9.   Assuming an illegitimate tax scheme satisfies the fraud element of section 548 (a)(1)(A), such fraud must be on "any entity to which [AHF] was or became, on or after the date that such . . . obligation was incurred . . . ." *Id*. In short, the fraud is perpetrated not on the claimant, Horton, but on other creditors of AHF.[2]

10.  The Trustee argues the fraud element is satisfied by inferring fraud from the so-called fraudulent tax scheme. This is a difficult leap for the Court. Sterquell, in setting-up the Horton Deal, was arranging Horton's ultimate claim for an illegitimate tax refund. The Trustee relies on cases that impute fraud on the debtor's part where the debtor participated in a Ponzi scheme. *See* n.1 (and accompanying cases). The Ponzi scheme cases make for a convenient analogy; it does not necessarily mean the requirements of the statute have been satisfied, however. While Ponzi schemes can involve multiple layers of complexity, they all arise from the basic concept that the earlier-solicited investors are paid from funds obtained from investors that participate later in the scheme. The problem, of

---

[2]With a fraudulent transfer, as opposed to a fraudulent obligation, the recipient of the transfer is not necessarily a claimant in the bankruptcy case. With an alleged fraudulent obligation, as here, the obligation represents the mirror image of the claim. The guaranty issued by AHF forms the basis for Horton's claim. It is nonsensical to construe the fraud element under subsection (a)(1)(A) as satisfied by the debtor's fraud *on the claimant*, i.e., by AHF's fraud on Horton.

course, is that once the scheme stops, the later investors are left holding the bag. The debtor, as proponent of such a scheme, has thereby participated in a fraud (the Ponzi scheme) and the parties defrauded are the late-to-the-scheme investors. In such instance, the statutory element is satisfied. *See* § 548(a)(1)(A). However, the scheme here is a tax scheme. The evidence establishes that the refund sought was illegitimate. Still the facts do not prove that AHF's scheme constituted a fraud on other investors or creditors of AHF. The benefit was the tax refund; such refund is not, on its face, at the expense of other investors. It is simply a different type of scheme.[3] The Trustee's section 548(a)(1)(A) charge fails because the evidence does not establish that AHF defrauded its other creditors.

11. Unlike the Trustee's actual fraud claim, which is premised upon the existence of an illegitimate tax scheme, the Trustee's constructive fraud claim under subsection (a)(1)(B) directly attacks the AHF Guaranty. The question here is whether AHF received reasonably equivalent value in exchange for the guaranty and whether it was insolvent on the date of the guaranty or became insolvent as a result of the guaranty. *See* § 548(a)(1)(B). The Trustee contends the Horton Deal is a textbook (a)(1)(B) fraudulent transfer. Horton is equally adamant that the Trustee's (a)(1)(B) claim fails because AHF "got the money." This is essentially a dispute concerning the basic facts of the Horton Deal. As outlined in detail in the Court's

---

[3]The Court is not concluding that any improper tax scheme cannot satisfy the fraud element of section 548(a)(1)(A). Were a debtor to knowingly incur obligations, as was done here with the AHF Guaranty, as part of a series of deals in which improper tax benefits are sought for each of the investors, such a scheme moves closer to the Ponzi scheme model. The multiple obligations, whether in the form of promissory notes or guaranties, would dilute the bankruptcy estate. More claims against the estate, arising as part of a fraudulent or illicit scheme, creates the very problem that section 548 seeks to address.

Statement of Facts (paragraphs ___ through ___), on November 19, 2008, Horton, the 99.99% owner of White Chapel, a limited partnership, loaned $1,413,720.00 to White Chapel; White Chapel, as maker, issued a promissory note in the same amount payable to Horton. AHF, the .01% general partner of White Chapel, issued its guaranty of the note. AHF is a purported non-profit entity. "Value" means "property, or satisfaction or securing of a present or antecedent debt of the debtor, but does not include an unperformed promise to furnish support to the debtor or to a relative of the debtor." 11 U.S.C. § 548(d)(2)(A). The value given, if any, is determined as of the time of the transaction, here the time of the closing of the Horton Deal. *See* § 548(a)(1)(B) ("value **in exchange** for such . . . obligation") (emphasis added). *See, e.g., Armstrong v. Collins*, No. 01 Civ. 2437(PAC), 2010 U.S. Dist. LEXIS 28075, at *60-61 (S.D.N.Y. Mar. 24, 2010).

12.     The Court also notes that a guarantor is one party in a three-party deal: the lender (Horton), the borrower and principal obligor (White Chapel), and the guarantor (AHF). On its face, AHF received not only less than reasonably equivalent value in return for the guaranty, it, in effect, received virtually no value. AHF had a .01% interest in White Chapel. According to the Agreement of Limited Partnership, White Chapel contributed $20.00 for its interest (Exhibit 17); Horton ostensibly contributed an interest valued at $157,080.00 for his 99.99% interest. The partnership agreement further provides that Horton and AHF share profits and losses in accordance with their respective percentage interest. *Id*. The Court recognizes that the value of a guaranty may be significantly less than the amount of

the debt covered by the guaranty. This arises from the notion that the principal

obligor, the borrower, is expected to repay the debt. Horton did not, however,

present evidence establishing that the AHF Guaranty should be discounted. On the

flip side, there is, despite Horton's protestations to the contrary, no evidence of

value received by AHF in exchange for its guaranty. Horton relies upon the fact

that Horton issued his check to AHF, not White Chapel. But AHF was its general

partner. It makes complete sense that the loan proceeds went to AHF. At closing,

AHF received the funds on behalf of White Chapel. White Chapel was the

borrower. Horton cannot conveniently skip this crucial part of the transaction.

Indeed, Horton made this very claim, i.e., that he made a loan of $1,413,720 to

White Chapel, in two other proceedings. *See* Findings *supra* at 90-91.

13. As evident from the testimony of Alan Weiner, AHF was insolvent at the time of

the Horton Deal. *See* Findings ¶ ___.

14. The elements of section 548(a)(1)(B) are satisfied.

D. **Section 548(c) Good Faith Defense Asserted by Horton**

15. Horton contends that even if the facts concerning the AHF Guaranty satisfy either

the actual or constructive fraud bases for avoidance, he established the good faith

defense under section 548(c). Such provision provides as follows:

> Except to the extent that a transfer or obligation voidable under this section is voidable under section 544, 545, or 547 of this title, a transferee or obligee of such a transfer or obligation that takes for value and in good faith has a lien on or may retain any interest transferred or may enforce any obligation incurred, as the case may be, to the extent that such transferee or obligee gave value to the debtor in exchange for such transfer or obligation.

11 U.S.C. § 548(c). Horton contends he gave the $1,413,720.00 to AHF, that he did so in good faith, and thus the avoidance of the AHF Guaranty obligation is enforceable to such extent. As for the value component, the Court refers to the above discussion concerning reasonably equivalent value given in connection with the guaranty. The issue is essentially the same as, here, there is no issue concerning the conveyance of property "in exchange for" the AHF Guaranty. The property of value that Horton parted with was the loan funds which, as discussed above, went to White Chapel. This alone defeats the section 548 defense, an exclusive defense to such a fraudulent obligation claim. *See In re IFS Fin. Corp.*, 417 B.R. 419, 441 (Bankr. S.D. Tex. 2009) (stating that once plaintiff has established a fraudulent transaction, defendant must prove that he gave value and acted in good faith to assert a defense).[4] The test is conjunctive: Horton must prove both good faith and that, as obligee, he gave value in exchange for the guaranty. The problem of course is that Horton did not give value to AHF.

16. Lest this appears harsh and too technical, the Court will examine the good faith component of the defense, as well. In determining good faith, courts in the Fifth

---

[4]*IFS* was interpreting the Texas Uniform Fraudulent Transfer Act (TUFTA) which is "virtually identical" to section 548 of the Code. Cases interpreting TUFTA are frequently relied on in section 548 cases and vice versa. *See Warfield v. Byron*, 436 F.3d, 551, 558 (5th Cir. 2006); *Levit v. Spatz (In re Spatz)*, 222 B.R. 157, 168 (N.D. Ill. 1998) ("Once a plaintiff has established fraudulent intent, the only defense [available to defendant is to prove that defendant gave reasonably equivalent value and acted in good faith]") (interpreting Illinois' version of the UFTA, 740 ILCS § 160/9(a). Findings of law relating to Illinois' UFTA and to the fraudulent transfer and obligation provisions of the Bankruptcy Code are applicable to each other. *Id.* at 164); *Durkin v. Shields (In re Imperial Corp. of Am.)*, 1997 U.S. Dist. LEXIS 20943 at 13 (S.D. Cal. 1997) ("In order to establish a defense to avoidability [under §548], the transferee must show both that the transfer [or obligation] was for reasonably equivalent **value** and that it was in **good faith**.)"; *See Also 5-548 Collier on Bankruptcy P 548.09* (listing the only pertinent defense available to Horton under §548 as a §548( c) defense). Courts should not add substance to the Bankruptcy Code when the text is plainly cumulative. *See In re IFS Fin. Corp.*, 417 B.R. at 447-8 (*citing Norwest Bank Worthington v. Ahlers,* 485 U.S. 197, 206, 108 S. Ct. 963, 99 L. Ed. 2d 169 (1988)). This is not a case in which a gap exists in the Code that needs to be filled through judicial interpretation.

Circuit and across the nation use an objective standard, examining what the defendant, as a reasonably prudent person, should have known instead of what they actually knew relating to the fraudulent transaction. *See, e.g.*, *Warfield*, 436 F.3d 551, 559 (5th Cir. 2006) ("in context of § 548 of the Bankruptcy Code, good faith is determined by looking at what the transferee 'objectively knew or should have known instead of examining the transferee's actual knowledge from a subjective standpoint.'"), citing *In re Sherman*, 67 F.3d 1348, 1355 (8th Cir. 1995)).

17.   Here, the Court goes back to the Horton Deal. Horton had to know and must be accountable for his direct involvement. He certainly knows and understands the basic legal effect of making a loan, receiving a note in return, and, in addition, receiving a guaranty of the note and loan. Though Horton may not be a "detail guy" and though he may be a "people person," and a person who values the "character" of the person on the other side of a deal, he is also a successful and shrewd businessman. Horton understands what it means to be a 99.99% owner of a limited partnership and, most important, he understands the effect of cutting his check to AHF on the same day that he signed-off on all documents for the Horton Deal. It is plausible that Horton had no real understanding of how he was to receive such a large tax refund as a result of the Horton Deal, but he did understand and, in fact, he counted on both the $3+ million tax refund and repayment of his loan to White Chapel.

18.     Horton is essentially asking the Court to simultaneously enforce a part of the

Horton Deal, the guaranty, but ignore his loan to and note from White Chapel.

This is nonsensical. This was a strange deal on its face, a deal that deserves close

scrutiny. Horton knew it was a strange deal. The check, according to Ripley in a

snippet of candid testimony, was at the time the largest check she had seen Horton

ever issue. The deal became more curious a few months later in March 2009 when

Horton signed the $15.7 Million Non-Recourse Note. The Horton Deal does not

bear the "earmarks of an arms-length" transaction. *In re Sherman*, 67 F.3d at 1355

("to determine whether good faith exists, the court looks to whether 'the

transaction carries the earmarks of an arms-length bargain.'"), citing *In re

Robbins*, 91 B.R. 879, 886 (Bankr. W.D. Mo. 1988). Horton was wearing multiple

hats during the execution of the Horton Deal. He was a limited partner, a lender,

and a beneficiary of a guaranty issued by the .01% general partner. Apart from

pointing the finger at Sterquell and thus AHF, Horton offers no evidence to justify

the Court's ignoring of the fundamental legal ramifications of the Horton Deal.

Horton entered into the Horton Deal voluntarily and without compulsion. Relative

to the motives of legitimate creditors in the AHF Bankruptcy Case, the Court

cannot conclude that Horton acted in good faith in connection with the Horton

Deal.


E.      **Section 510(b) & (c) Causes of Action for Subordination**

19.     As the Court has determined that AHF's obligation arising from the AHF Guaranty

is voided under section 548(a)(1)(B) of the Bankruptcy Code, it is not necessary to

address the Trustee's section 510 claims for subordination. The Court will,

however, summarily address these claims.

20.     The Trustee's claim for mandatory subordination under section 510(b) of the

Bankruptcy Code must be premised upon a recharacterization of the Horton Deal.

The Court would need to conclude that the Horton Deal was essentially an

investment with Horton's interest being recharacterized as an equity interest. This

is obviously contrary to the Court's determination that the transaction giving rise

to the Horton Deal—the loan to White Chapel, the promissory note back from

White Chapel, and the AHF Guaranty which guarantees the note—are binding on

Horton in accordance with their terms and the context in which they arise, i.e.,

Horton as lender and 99.99% interest owner in White Chapel; White Chapel as the

limited partnership and as borrower and maker of the promissory note; and AHF as

.01% interest general partner and issuer of the AHF Guaranty.

21.     The Trustee's claim for equitable subordination under section 510(c) is likewise

problematic. The Fifth Circuit has articulated a three-prong test for equitable

subordination: (1) the claimant must have engaged in inequitable conduct; (2) the

misconduct must have resulted in injury to the creditors of the bankrupt or

conferred an unfair advantage on the claimant; and (3) equitable subordination of

the claim must not be inconsistent with the provisions of the Bankruptcy Code. *See

In re Mobile Steel Co.*, 563 F.2d 692 (5th Cir. 1977). The evidence here may

indeed support the first and third prongs of the test. Satisfying the second prong, however, is questionable. The only injury here from Horton's conduct would be the dilution of the creditor body: Horton's claim, which arguably arises from his inequitable conduct, creates an additional claim against the bankruptcy estate and thus, to the extent it would share in any recovery from the estate, the estate and other creditors are damaged. However, allowing dilution to satisfy the injury prong effectively conflates the first and second prongs of the test. In addition, the Fifth Circuit's opinion in *In re SI Restructuring, Inc.*, 532 F.3d 355 (5th Cir. 2008), casts serious doubt on the notion that dilution of the creditor pool satisfies the injury prong.

F. **Other Claims by Horton /** ***In Pari Delicto***

22.     In addition to his claim under the AHF Guaranty, Horton asserts three other affirmative, yet alternative, bases for allowance of his claim. He asserts an equitable claim for money had and received, a claim for breach of fiduciary duty by AHF, and, his ultimate fallback claim, a claim that AHF defrauded him.

23.     These claims, similar to his defenses to the Trustee's section 548 claims, ignore the ramifications of either the transaction documents or the legal relationships arising from the Horton Deal.

**Money Had and Received Claim**

24.     Horton asserts that "AHF received, had, and benefitted from money that rightfully belongs to [him]—specifically $1,413,720 that Horton delivered to AHF on November 19, 2008. AHF has failed and refused to pay that money back to Horton

or even recognize Horton's claim. That money, in equity and good conscience, belongs to Horton." Joint Pre-trial Order ¶ 101.

25.     The Texas Supreme Court has described the money had and received cause of action as follows:

> The question, in an action for money had and received, is **to which party does the money, in equity, justice, and law, belong. All plaintiff need show is that defendant holds money which in equity and good conscience belongs to him.** Again, it has been declared that a cause of action for money had and received is less restricted and fettered by technical rules and formalities than any other form of action. **It aims at the abstract justice of the case, and looks solely to the inquiry whether the defendant holds money, which belongs to the plaintiff.**

*Staats v. Miller*, 243 S.W.2d 686, 687-88 (Tex. 1951) (internal quotes and citations omitted) (emphasis added).

26.     The parties seeking recovery under this theory must offer evidence conclusively showing that the defendant was holding or in possession of money that rightfully belonged to the claimant. *See Urban Living v. Pruneda*, 2010 Tex. App. LEXIS 9806, *47-48 (Tex. App.—Houston 2010).

27.     In *Phippen v. Deere & Co.*, 965 S.W.2d 713 (Tex. App.—Texarkana, 1998), the Court upheld a jury verdict finding Phippen and another entity liable under the money had and received theory. The court explained that

> Money had and received is an equitable doctrine applied to prevent unjust enrichment. An action for money had and received arises when one person obtains money which in equity and good conscience belongs to another, and it belongs conceptually to the doctrine of unjust enrichment. It is a quasi-contractual action involving an implied promise and leading to a claim of debt not evidenced by a writing.

*Id*. at 725 n.1 (internal quotes and citations omitted).

28. As a general rule, if a valid express contract exists between the parties, there can be no recovery under a money had and received theory. *See Prime Income Asset Mgmt. Inc. v. One Dallas Ctr. Assocs. LP*, 358 Fed. Appx. 569, 572 (5th Cir. 2009) (unpublished); *Pride Cos., L.P. v. Varde Partners, Inc. (In re Pride Cos., L.P.)*, 2001 Bankr. LEXIS 2245, **106-07 (Bankr. N.D. Tex. 2001); *Urban Living v. Pruneda*, 2010 Tex. App. LEXIS 9806, *46 (Tex. Civ.—Houston [1st] 2010).

29. The fact that the defendant no longer holds the funds (because they have been transferred or given away) is not relevant to a cause of action for money had and received. *Newington v. Forrester*, 2008 U.S. Dist. LEXIS 92601, *15 (N.D. Tex. Nov. 13, 2008).

30. There are two basic problems with Horton's claim under this theory. First, Horton's rights are controlled by an express contract between the parties. Second, under the Horton Deal, Horton voluntarily and with knowledge parted with his funds by lending them to White Chapel. Horton fails to satisfy the most basic requirement of this theory, that is, that AHF was holding money that belongs to Horton.

31. Horton's equitable claim for money had and received will be denied.


**Horton's Claim of Breach of Fiduciary Duty**

32.     Horton asserts that AHF, as general partner of White Chapel, breached its
        fiduciary duty to Horton, its limited partner, by "employing and permitting
        Sterquell to employ funds and assets of White Chapel to the benefit of AHF and
        not White Chapel. That breach caused Horton a loss of $1,413,720, plus accrued
        interest and attorney's fees." Joint Pre-trial Order ¶ 110.

33.     Under this theory, Horton recognizes that he made the loan to White Chapel.

34.     This theory ignores the big picture: Horton knew that the loan funds were going to
        be used in Sterquell's "housing fund"; and they were in fact so used as evident
        from Weiner's testimony. In addition, Horton's primary objective was obtaining
        tax relief in the form of a tax deduction and a $3+ million tax refund. Horton knew
        that the use of the loan funds were somehow instrumental in achieving his main
        objective. The Court fails to appreciate how such circumstance gives rise to a
        viable claim for breach of fiduciary duty.

35.     The Court further notes that, at least in argument, Horton's counsel indicated that
        the breach of fiduciary duty claim impacts the "good faith analysis." The Court
        assumes this refers to the good faith defense under 548(c1) (*See* discussion *supra*).

36.     The Court agrees that Horton's claim for breach of fiduciary duty must arise from
        the relationship between AHF and Horton. AHF became the general partner of
        White Chapel and Horton became the limited partner *as a result of the Horton
        Deal*. Their respective roles as general partner and limited partner do not effect the
        good faith analysis.

37. The other problem with this claim is that Horton does not have standing to assert this claim on behalf of White Chapel. Standing is a component of a court's subject-matter jurisdiction. *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 446, 36 Tex. Sup. Ct. J. 607 (Tex. 1993). The claimant has the burden of alleging facts that affirmatively demonstrate a court's jurisdiction to hear a case. *Id*. Standing, as a component of subject matter jurisdiction, may be raised for the first time by the court. *See, e.g., Lance v. Coffman*, 549 U.S. 437, 439 (2007). In deciding questions of law involving partnerships, including standing, applicable state law governs. *See Crocker v. Fed. Deposit Ins. Corp.*, 826 F.2d 347, 349 (5th Cir.1987).

38. A limited partner, in Texas, depending on the alleged cause of harm and the alleged harm suffered, may bring any of three claims against a general partner of a limited partnership: a direct claim, a derivative claim, or a class action. *Mallia v. PaineWebber, Inc.*, 889 F. Supp. 277, 281 (S.D. Tex. 1995). Questions of Horton's standing to bring a class action are obviously not applicable.

39. The Texas Business Code recognizes that limited partners will often have a substantial, selfish interest in claims that properly belong to a limited partnership. Thus, the Code allows limited partners to take the reins of litigation on behalf of the partnership when the general partner has failed to do so or is unlikely to do so. Tex. Bus. Code. §153.401. However, here, Horton ignored this right (which he would have certainly qualified for given the immense unlikeliness of AHF suing itself) and attempts to bring his claim as a direct one.

40.     Under Texas law, a limited partner has standing to bring a direct action against a partnership if the aggrieved partner has suffered a "personal cause of action and personal injury" that is not duplicative of claims held by the partnership and will not warrant "indirect" relief. *See  Murphy v. Campbell*, 964 S.W.2d 265, 268 (Tex. 1997) (quoting and citing *Wingate v. Hajdik*, 795 S.W.2d 717, 719 (Tex. 1990)). Both *Murphy* and *Wingate* involved shareholders bringing direct actions against corporations; however, their precedent also applies to partnerships. *See, e.g., R2 Enters. v. Whipple*, 2008 Tex. App. LEXIS 4780 (Tex. Ct. App.—Fort Worth 2008) (applying *Wingate* to limited partnership cases), pet'd for rev. denied by *R2 Enters. v. Whipple*, 2008 Tex. LEXIS 879 (Tex., Sept. 19, 2008); *7547 Corp. v. Parker & Parsley Dev. Partners, L.P.*, 38 F.3d 211, 221-22 (5th Cir. 1994) (holding that *Wingate*'s precedent applies to determining whether a limited partner has standing to directly sue his partnership); *id*. (finding that the existence of a Texas statute allowing limited partners to sue other partners derivatively on behalf of the partnership suggests that *Wingate*'s rationale applies to partnerships).

41.     A "personal" cause of action and "personal" injury do not mean that Horton was wronged and suffered harm resulting from AHF's behavior, rather he must have been wronged and been injured by AHF in a separate manner than White Chapel was. *See, e.g., Nauslar v. Coors Brewing Co.*, 170 S.W.3d 242, 250 (Tex. App.—Dallas 2005).

42.     Horton's claims of breach of fiduciary duty and misappropriation can be broken down into ones that allege that: a.) Horton gave money to White Chapel, b.) AHF

siphoned off money that properly belonged to White Chapel during AHF's management of White Chapel, c.) White Chapel lost value because of this, and d.) as a 99.99% stakeholder in White Chapel, Horton was harmed.

43. Horton was harmed if his complaint is taken at face value, but both his right of claim and his injury flow through White Chapel. Under Texas law, he has neither been uniquely wronged nor has he been separately harmed by AHF through the alleged fraud in collecting the money from Horton on behalf of the partnership or misappropriating it through its management of the partnership. *See Asshauer v. Wells Fargo Foothill*, 263 S.W.3d 468, 471-74) (Tex. App.—Dallas 2008) (denying standing to class of partners alleging they were fraudulently induced to invest in a sham partnership and that their investment was misappropriated by managing partner in the course of the fraud); *Wingate*, 795 S.W.2d 717 (stockholder in a corporation with two stockholders could not bring direct action alleging that other stockholder breached fiduciary duty to corporation or that other stockholder misappropriated corporate assets); *Whipple*, 2008 Tex. App. LEXIS 4780 (denying standing to two partners in a three person limited partnership against third partner for breach of fiduciary duty, conversion, and breach of loyalty). Neither Horton's claim nor his injury are "personal."[5]

44. Further, if Horton's claim were to be successful, relief, which would take the form of payment from AHF to Horton, would be indirect. This is because Horton,

---

[5]An example of a personal injury is one that affects the claimant's interest independent of their interest in the partnership or corporation. *See Gannon v. Baker*, 807 S.W.2d 793, 798-99 (Tex. App. 1991) (finding that claims resulting from misappropriating corporate funds are not personal, while claims of conversion of plaintiff's private property were); *Johnson v. J. Hiram Moore, Ltd.*, 763 S.W.2d 496 (Tex. App.—Austin 1998) (injuries were personal because partner suffered out-of-pocket financial harm from general partner's fraudulent behavior).

solely, would collect proceeds that properly belong to the partnership. *See, e.g.,* *Asshauer*, 263 S.W.3d at 472. It is tempting to argue, though, that because Horton was the only other partner besides AHF who had a stake in White Chapel and because he owned 99.99% of the partnership, to say that relief to him in this case would be indirect "makes no sense at all." *See* James R. Burkhard*, LLC Member and Limited Partner Breach of Fiduciary Duty Claims: Direct or Derivative Claims?*, 7 J. Small & Emerging Bus. L. 19, 28 (Sp. 2003) (arguing for a flexible approach to granting standing to partners who are harmed by the action of other partners in small partnerships).

45.     It does make sense, however, to reserve these claims to the partnership itself, even in cases involving small amounts of partners, because the partnership is a separate legal entity with separate rights and obligations from its individual partners. *Blasberg v. Oxbow Power Corp.*, 934 F. Supp. 21, 22 (D. Mass. 1996) ("Defendants' [limited partners'] argument [that they should be able to sue the general partner directly for embezzlement, breach of fiduciary duty, etc.] ignores the existence of the Partnership as an independent legal entity that retains its own rights, obligations and property, only a proportion of which, upon dissolution or by distribution, may belong to the limited partners."). The entire **purpose** of forming a limited partnership is to shift responsibility, risk, and liability away from oneself onto another entity. If two people were involved in a limited partnership and were sued by a third party from actions resulting from the course of business, a court would not decline to afford them the protections of a partnership just because the

partnership is small. Likewise, just because Horton is the only limited partner does not mean that he gets to ignore the standing problem. The partnership has rights independent of Horton, despite his 99.99% interest in it and independent from both of its partners collectively.

46. In this case, and in others like it, partners are not the only ones with an interest in litigation involving incestuous partnerships. This is the reason why Texas courts have consistently denied standing to partners and shareholders who seek to sue a misbehaving general partner or manager. *See Asshauer*, 263 at 471-74 (denying standing to class of partners alleging they were fraudulently induced to invest in a sham partnership and that their money was misappropriated by managing partner in the course of the fraud.); *Wingate*, 795 S.W.2d 717 (stockholder in a corporation with two stockholders could not bring direct action alleging that other stockholder breached fiduciary duty to corporation or that other stockholder misappropriated corporate assets); *Whipple*, 2008 Tex. App. LEXIS 4780 (denying standing to two partners in a three person limited partnership against third partner for breach of fiduciary duty, conversion, and breach of loyalty). Think, for example, if White Chapel owed a third party creditor $500,000 resulting from a judgment. The creditor, of course, cannot sue Horton, as Horton is protected as a limited partner, and would have a difficult time collecting from the General Partner, AHF, which is insolvent. The creditor's only recourse would be to sue White Chapel. The creditor, therefore, certainly has an interest in White Chapel being privileged from pursuing claims that properly belong to the partnership without having its partners

undercut it (and therefore others that have done business with it) by bogus direct suits.  Partnerships are not just two people doing business with each other, but instead are separate legal entities with distinct rights and obligations independent from their member partners. *Compare Sturges v. Wal-Mart Stores*, 39 S.W.3d 608, 614-15 (Tex. App.—Beaumont 1999) (ruling that individuals have standing to sue their business associate because a legal partnership was never formed and only contemplated) *with Nauslar v. Coors Brewing Co.*, 170 S.W.3d 242, 251 (Tex. App.—Dallas 2005) (rejecting plaintiff's argument that *Sturges* allowed plaintiffs, who were limited partners, to bring a direct action that concerned the loss of value in the partnership, **because** they had formed a legal partnership) ("The proposed entity in Sturges was never formed, leaving the principals in that enterprise as the directly injured parties. In today's case, the direct injury from Defendants' alleged wrongdoing was to … the [partnership].").

47.     It does not matter that White Chapel was set up as essentially a shell, possibly fraudulent, partnership in this analysis. *Asshauer*, 263 S.W.3d at 472. White Chapel was still a partnership and Horton still could have sued White Chapel derivatively, but has apparently chosen not to. Horton wants to have his partnership cake and eat it too.

**Horton's Claim that He Was Defrauded by AHF**

48.     In asserting a fraud claim against AHF, Horton makes the following specific allegation:

Sterquell made representations to Horton about the transaction in which Horton made a loan of $1,413,720, specifically, that AHF was solvent and could pay back the loan plus interest on or before April 1, 2009, and that Horton's loan was protected by AHF's guaranty. These representations were material and they were false. Sterquell knew the representations were false, or made the representations recklessly, as a positive assertion, and without knowledge of its truth. Sterquell made these representations with the intent that Horton rely and act on them, which Horton did by entering into a binding agreement based on the misrepresentations. Sterquell defrauded Horton in connection with the White Chapel note and AHF guaranty and fraudulently induced Horton into making the loan to White Chapel. Sterquell's misrepresentations caused injury to Horton in the amount of $1,413,720, plus interest accrued on that amount and attorney's fees.

Joint Pre-trial Order ¶ 111.

49.     Horton then asserts that

AHF, having benefitted from Sterquell's fraud . . . and wrongful conduct in connection with the transaction from which Horton's claim arises, may not preclude enforcement of Horton's claim on the basis of any wrongful conduct by Horton in connection with that transaction. Because AHF's authorized agent participated in the conduct about which the trustee complains, the trustee may not bar or avoid enforcement of Horton's claim.

Joint Pre-trial Order ¶¶ 114 and 115.

50.     To have standing for a claim of fraud against AHF, Horton must prove that a.) he was acting as a lender and not as a partner, and b.) Sterquell was acting as AHF's agent during the course of the alleged fraud.

51.     Horton was acting as a lender. Texas law recognizes that partners may loan independently to their partnership and still retain direct claims. Tex. Bus. Code § 154.201 ("A partner may lend money to and transact other business with the partnership. Subject to other applicable law, a partner has the same rights and

obligations with respect to those matters as a person who is not a partner."). *See also, Wingate*, 795 S.W.2d 717 (case noted that partner plaintiff had personal claims against partnership relating to fraud, but voided award because it lumped derivative and direct claims together).

52.     Though Horton's claims are premised upon misrepresentations made by Sterquell, the Court will assume for purposes of its analysis that AHF is deemed to have made the same alleged misrepresentations.

53.     The Court generously construes the pleadings to sufficiently raise a fraud claim against AHF and that Horton has standing to pursue a claim of fraud as he was acting as White Chapel's lender and Sterquell was acting as AHF's agent.

54.     Horton's claims for fraud fail on the merits. AHF's alleged misrepresentation, to be actionable, must have been a.) false, b.) known to be false by AHF, c.) made with the intent to defraud Horton as lender, and d.) relied on by Horton. *See Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 337 (Tex. 2011).[6]

55.     The evidence reveals that White Chapel was set-up for the **very purpose** of losing money. The fact that the partnership would be unprofitable was the reason that Horton loaned the partnership the $1,413,720. He arguably relied on representations from Sterquell, acting as an agent of AHF, that White Chapel would lose money so that Horton could ultimately receive a $3+ million tax

---

[6]The elements of fraud are: (1) that a material representation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the speaker made the representation with the intent that the other party should act upon it; (5) the party acted in reliance on the representation; and (6) the party thereby suffered injury.

refund. He did expect his principle of $1,413,720 back—but he expected it back in the form of the guaranty by AHF (*see supra* for discussion of fraudulent guaranty).

56. Horton proved that Sterquell provided financial information reflecting significant net worth of both AHF and Sterquell (*see* Findings of Fact ___ to ____). Horton implies that he relied on this information before advancing the $1,413,720. This simply reveals that, at most, Horton relied on such information in accepting AHF's and Sterquell's guaranties as part of the Horton Deal. Horton does not get credit for relying upon such information in making the loan to White Chapel.

57. The Court concludes that Horton did not, in entering into the Horton Deal, rely on specific financial information of AHF. Horton's primary objective was to recoup taxes paid in prior years. Horton went along with the deal because he wanted the $3+ million tax refund that awaited him at the end. Even if White Chapel failed to repay the White Chapel Note of $1,413,720, plus interest, and Horton knew it would not repay it at the time he made the loan, he still would have done the Horton Deal for the tax refund.

58. But the Court takes a closer look at Horton's fraud claim. At most, Horton did one thing in reliance on the financial information of AHF: he made a loan to White Chapel. It is nonsensical to say Horton was fraudulently induced to accept a guaranty from AHF. The White Chapel Note and the AHF Guaranty are two related but still two very distinct legal instruments, each of which give rise to specific legal obligations. So, can Horton really say he was induced by AHF's arguably fraudulent representation to advance funds to White Chapel? Horton

received a note from White Chapel in return for his loan. The critical information for making a loan is information that causes the lender to believe the loan will be repaid. AHF's financial condition, and for that matter, Sterquell's financial condition, had no bearing on White Chapel's ability to repay the loan. This inevitably leads back to the AHF Guaranty. The Court does not believe that the circumstance here gives rise to a fraud claim by Horton against the debtor AHF. If it did, it would undermine section 548 of the Bankruptcy Code; it would allow a claim that is otherwise avoided as a fraudulent obligation of the debtor. Section 548 of the Bankruptcy Code does not recognize such a fraud exception, unless the good faith defense incorporates such an exception. Horton has not cited to the Court any authority that supports the allowance of a fraud claim in a circumstance such as exists here.

59. The Court further concludes, as yet another basis for denying Horton's fraud claim, that the fraud claim is an attempt to enforce what the Court has determined to be an illegal contract. A party generally cannot bring a claim that arises from, is founded upon, or is directly related to an illegal contract. *Texas & P. Coal Co. v. Lawson*, 89 Tex. 394, 402 (Tex. 1896) ("It results from what has been said that the contract . . . is . . . void [as illegal] and no action or counterclaim can be founded thereon."); *Grapeland Motor Co. v. Lively*, 274 S.W. 168, 170 (Tex. App. 1925) (The contract being in violation of law…gave no rights to either party enforceable by the courts, but they will be left just where they have placed themselves.).

60. While the AHF Guaranty does not implicate criminal law, it nonetheless violates the law, and is thus considered illegal and void. *Tuckett v. Herdic*, 5 Tex. Civ. App. 690 , 694 (Tex. App.—Dallas 1893) ("Because the State does not punish [the contract] criminally . . . is no ground for holding such illegal contracts valid, when the civil statutes declare them to be void."); 1-6 Murray on Contracts § 98, Contracts Against Public Policy—"Illegal Bargains." ("If an agreement is prohibited by statute, there is considerable certainty as to the policy reason for refusing its enforcement."). *See Also Phillips v. Phillips*, 820 S.W.2d 785, 786-7 (Tex. 1991) (finding that a contract that had an unenforceable unliquidated damages provision according to common law principles, "illegal" and that "enforcement of an illegal agreement [such as one that contains illegal unliquidated damages] violates public policy.").

61. A party can, though, bring a claim if it is **collateral** to the illegal contract, thus the Court must decide whether Horton's claim is collateral to or directly related to the illegal guaranty. *See McMullen v. Hoffman*, 174 U.S. 639, 657-8 (1899); 15-89 Corbin on Contracts § 89.11, Collateral or Remote Bargains or Acts (2011) (courts should enforce claims that are "collateral" to the illegal contract). A claim is collateral when it has a sufficient independent existence from the illegal contract; for example, where a separate contract was based on the existence of the void contract,[7] or where an innocent third party has a claim arising independently from

---

[7] *Armstrong v. Toler*, 24 U.S. 258, 269 (1826) (Justice Marshall) ("A new contract, founded on a new consideration, although in relation to property respecting which there had been unlawful transactions between the parties, is not itself unlawful.").

the illegal contract.[8] Here, Horton's claim against White Chapel for the money loaned would be an example of a collateral claim that still stands even though it was predicated on an illegal contract, as might a claim by a third party who in good faith bargained for Horton's benefit of the guaranty for separate consideration. Horton's claim here, though, is not collateral, but is founded upon the illegal guaranty contract. He asks for AHF to reimburse him for the money he loaned to White Chapel because of AHF's fraudulent statements that induced him into entering the illegal guaranty contract. Horton's claim is founded on the illegal contract and he must resort to the contract in order to bring his claim.  Therefore, his claim is founded upon the illegal contract and is void. *See Texas & P. Coal Co. v. Lawson*, 89 Tex. 394  (Tex. 1896) ("It results from what has been said that the contract . . . is . . . void [as illegal], and **no action or counterclaim can be founded thereon**.") (emphasis added); *McMullen v. Hoffman*, 174 U.S. 639, 655 (1899), citing with approval *Thomson v. Thomson*, 7 Ves. 468 (England) (1802) ("In Thomson v. Thomson . . . the plaintiff was not permitted to recover, because he had no claim to the money except through the medium of an illegal agreement."). Public policy disfavors such an award. *See Phillips v. Phillips*, 820 S.W.2d 785, 789 (Tex. 1991). When Courts encounter a claim that directly relates to an illegal contract they should as a rule, leave the parties "as [the Court] finds

---

[8] *Sheahan v. McClure*, 199 Mich. 63 (Mich. 1917) ("When [an illegal] wagering contract has been executed and its fruits paid to the agent or partner of the winner, the recipient of the fund cannot shield himself [from his other creditors] by setting up the vice of the original transaction. Neither is it any affair of a bailee of such money or property that the parties have been gambling or intend to gamble; the invalidity of their proceedings does not affect his contract as bailee.") (cited by 15-89 Corbin on Contracts § 89.11 "Collateral or Remote Bargains or Acts" (2011).

them." *Plumlee v. Paddock*, 832 S.W. 2d 757, 759 (Tex. App.—Fort Worth

1992)*; Grapeland*, 274 S.W. 168, 170; Restatement (Second) of Contracts §197,

Restat 2d of Contracts, § 197 (1981) ("Generally . . . [a court] . . . will simply

leave both parties as it finds them [when considering enforcing terms of an illegal

contract], even though this may result in one of them retaining a benefit that he has

received as a result of the transaction."). This policy is meant to deter parties from

entering into illegal contracts, which often, like here, end up harming one of the

parties involved as well as the public and those protected by the statute. *See*

*Continental Wall Paper Co. v. Louis Voight & Sons Co.*, 212 U.S. 227, 263

(1909) ("The more plainly parties understand that when they enter into contracts

of this nature they place themselves outside the protection of the law, so far as that

protection consists in aiding them to enforce such contracts, the less inclined will

they be to enter into them."). The Court also declines to apply equitable principles,

including *in pari delicto* that are the rare exception to the rule because Horton did

not act in good faith during the formation of the contract, no other factors or facts

are present to persuade the Court to rescue Horton from his illegal contract at the

expense of AHF's other legitimate creditors, and the public would not benefit from

allowing the defense. *See Lewis v. Davis*, 145 Tex. 468, 477 (Tex. 1947) (*In pari*

*delicto* is "not for the benefit of either party and not to punish either of them, but

for the benefit of the public.").

62.    Horton's fraud claims arising out of the illicit guaranty are barred.

### ***In Pari Delicto***

63.     Counsel for Horton has, in argument, raised the equitable defense of *in pari delicto*, which literally means, "at equal fault." It is an equitable affirmative defense that a defendant may assert against a plaintiff if the plaintiff has acted equally or more wrongly than the defendant through conduct relating to the plaintiff's claim.

64.     In pari delicto defense is founded on state common law.  *See Niellson v. Lernout*, 469 F.3d 143, 154 (1st Cir. 2006).  The first part of the Court's analysis concerns whether the plaintiff acted wrongfully and whether their wrongful behavior contributed to their successful claim. *In re IFS Corp.*, 2007 WL 1308321, *3 (Bankr. S.D. Tex.  2007) (citing *Plumlee v. Paddock*, 832 S.W.2d 757, 759) (Tex. App.— Fort Worth 1992)). For purposes of the analysis, the Court assumes that AHF acted fraudulently concerning the AHF Guaranty, and that this behavior is connected to the voidance of the guaranty.

65.     However, the heart of the analysis examines whether allowing the defense benefits public policy, as in pari delicto is meant for the benefit of the public, not any individual litigant. *Lewis v. Davis*, 145 Tex. 468, 477 (Tex. 1947), cited by *Floyd v. CIBC World Mkts., Inc.*, 426 B.R. 622, 643-44 (Bankr. S.D. Tex. 2009). The decision whether to allow a defendant to block plaintiff's recovery "depends upon the peculiar facts and equities of the case, and the answer usually given it is that which it is thought will better serve public policy." *Id*.

66.     The Trustee, though he stands in the shoes of the debtor, is not representing the interests of AHF, but rather, the collection of creditors who currently possess claims against AHF.  *See Hill v. Day (In re Today's Destiny Inc.)*, 388 B.R.

737,749 (Bankr. S.D. Tex. 2008) ("The need to consider the 'peculiar facts and equities' [of an *in pari delicto* defense] is particularly acute when a defendant is asserting the defense against a Trustee who seeks recovery for the benefit of creditors of a wrongdoer rather than the wrongdoer himself.")[9] Here, the estate loses if the obligation arising from the AHF Guaranty survives.

67.     Allowing Horton to assert an *in pari delicto* defense to potentially defeat the Trustee's section 548 claim also dilutes the purpose and force of the statute.  The Supreme Court has ruled that when analyzing an *in pari delicto* defense against a statutory claim, a court must consider whether allowing the defense emasculates the statute's purpose. *See Perma Life Mufflers, Inc. v. Int'l Parts Corp.*, 392 U.S. 134, 138-40 (1984) (finding that Congress did not intend to allow defendants to assert *in pari delicto* defenses under an antitrust statutory scheme because of the importance of deterring antitrust violations), overruled on other grounds by *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1968); *Bateman Eichler*, 472 U.S. 299, 310 (1985), citing *Perma Life*, 392 U.S. 134 (concluding that allowing defendants who were insider trading tippers to assert *in pari delicto* claims against insider trading tippees in fraud claims would undermine the purpose of securities laws to deter unfair trading practices).  The assertion of an *in pari delicto* defense within the confines of section 548 is problematic. Though Horton claims that he was personally defrauded, the Court will not allow him to knock-out

    [9]*See generally*, Robert Bruner, *The Collapse of the In Pari Delicto Defense to Bankruptcy Trustee Claims: How the 5th Circuit has Opened a New Door for Trustee Litigation*, 17 Tex. Wesleyan L. Rev. 91 (Winter 2011) (discussing the importance that Courts consider the trustee's unique, representative role when entertaining *in pari delicto* defenses in bankruptcy litigation and reviewing recent case law regarding the issue).

the Trustee's successful section 548 claim through an affirmative defense that largely consists of parroting back the language of the Trustee's complaint.

68. The Court finds that public policy precludes Horton's assertion of the defense, especially given the Court's conclusion that Horton did not himself enter the transaction in good faith. Allowing Horton's *in pari delicto* defense does not deter future wrongdoing, does not prevent unjust enrichment, degenerates the Bankruptcy Code and principles of equity, and offends public policy. Therefore, his affirmative defense is denied.

69. The issues raised in this matter involve mixed questions of fact and law. Accordingly, where appropriate, findings of fact may be considered conclusions of law and conclusions of law may be considered findings of fact.

### End of Findings of Fact and Conclusions of Law ###